UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| EVONNE FAGLER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 4:14CV1956 RLW |
| | ) | |
| CAROLYN W. COLVIN, | ) | |
| Acting Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM AND ORDER

This is an action under 42 U.S.C. § 405(g) for judicial review of Defendant's final decision denying Plaintiff's application for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act. For the reasons set forth below, the Court reverses the decision of the Commissioner and remands for further proceedings.

## I. Procedural History

On July 28, 2011, Plaintiff protectively filed an application for DIB alleging disability beginning August 19, 2010 due to a spinal fusion, paralyzed right foot and partial leg, neuropathy, and depression. (Tr. 243, 309, 426-28) The application was denied, and Plaintiff filed a request for a hearing before an Administrative Law Judge ("ALJ"). (Tr. 309-31) On May 3, 2013, Plaintiff testified at a hearing before the ALJ. (Tr. 265-308) On June 3, 2013, the ALJ determined that Plaintiff had not been under a disability from August 19, 2010, through the date of the decision. (Tr. 243-53) Plaintiff then filed a request for review, and on September 23, 2014, the Appeals Council denied Plaintiff's request. (Tr. 1-3) Thus, the decision of the ALJ stands as the final decision of the Commissioner.

## II. Evidence Before the ALJ

At the May 3, 2013 hearing before the ALJ, Plaintiff appeared and was represented by counsel. Plaintiff testified that she was 47 years old. She weighed 170 pounds and measured 5 feet 5 inches. She stated that her weight had gone up because she was unable to do things she used to be able to do. Plaintiff woke up in the morning and got her pills ready. She then fed her indoor animals. She also had four chickens and two roosters outside. She brought in eggs daily. Plaintiff lived on a 3 ½ acre property. She was married, but her husband worked in Nebraska, where he owned a construction company. He visited on the weekends. Plaintiff's husband paid all the bills for the home in Eldon, Missouri, where Plaintiff resided. She owned a computer tablet and sat on her electric recliner while using the Internet. (Tr. 269-74)

Plaintiff used a heating pad for her back and ice for her foot while reclining. She was able to prepare meals such as pizza with premade crust, toppings, and shredded cheese. She also purchased and prepared frozen meals. Plaintiff was able to wash the dishes and use a Swiffer to mop the floor. In addition, she vacuumed the carpeted areas of her home. (Tr. 274-77)

Plaintiff testified that she stopped working three days a week after she was released from the hospital, around August of 2012. She had a temporary handicapped parking pass because she could not walk very far. In order to grocery shop, she parked close to the store and used an electric cart. In addition, grocery workers followed her through the store and helped her. Plaintiff was able to drive to the store very slowly. However, she could not feel her right foot and required a left foot adapter to drive. Rehabilitation services through St. John's Mercy trained her to drive with the adapter. She was comfortable driving only short distances. (Tr. 277-80)

During a typical day, Plaintiff woke up around 9:00 AM depending on how well she slept. She stated that she had trouble sleeping. She would get her pills ready, feed the animals, and then eat cereal around 11:00 AM. She sat in her recliner to sleep and then remained there most of the day. She performed some chores, like house cleaning, on one day but needed to wait a day or two to perform another chore due to back pain. Chores such as sweeping caused a lot of pain, and she sometimes had to skip lunch. She would then get up to make supper, and she went to bed around 9:30 PM. She believed she reclined four or five hours a day. She split her time between the recliner, bed, and couch. Plaintiff testified that she needed to change positions after about an hour and a half. She drove to the mailbox, which was a quarter of a mile away. She was unable to walk to the mailbox due to severe pain, which caused her blood pressure to rise. (Tr. 280-83)

Plaintiff testified that she took mediation for hypertension, as well as Percocet and Oxycodone for pain. She had been taking narcotics for three years. Plaintiff also took Trazodone, Neurontin, Gabapentin, Cymbalta, and Lisinopril. The Cymbalta was prescribed for depression. Plaintiff received counseling from Dr. Fletcher during hour-long sessions. Plaintiff had some friends and neighbors that visited with her and drove her to appointments. Plaintiff further stated that the medications helped a little with pain but never brought complete relief. The medication did make her able to do things. (Tr. 283-87)

Plaintiff previously underwent four back surgeries. She stated that no other surgeries could help reduce the pain. However, she believed that the back surgeries made her worse. Plaintiff testified that standing and walking made her back pain worse. The pain was in her lower back. She also had neuropathy in her right foot stemming from her back condition. In

addition, Plaintiff had pain in her left leg that would come and go with standing and sitting. (Tr. 287-90)

Plaintiff further testified that she stored her cereal and milk straight in front of her because reaching up hurt her low back. She was unable to lift anything heavier than 10 pounds. Plaintiff stated that she did not pick up items in her kitchen that weighed more than a gallon of milk. She drank alcohol only when she went out to dinner socially. She had trouble going out to dinner because she was unable to sit for very long. (Tr. 290-93)

Plaintiff was involved in an on-the-job accident. She tried to return to work three days a week but only lasted a couple days due to pain. Plaintiff received Workers' Compensation, which included wages and medical treatment. The compensation for wages ended after the rehab doctor stated Plaintiff should be able to return to work. Plaintiff underwent a physical capacity evaluation but testified that she was unable to make through the questioning due to pain. Plaintiff continued to receive medical treatment through Workers' Compensation. She stated that she reached maximum medical improvement and now took pills for the pain. (Tr. 293-97)

Plaintiff testified that she was unable to work because every day that she was up, and days that she stayed in bed due to pain from pushing herself the day before, she was unable to get her pain under control. She had trouble sleeping, and she was unable to stand, sit, and walk during an eight-hour shift. When asked whether she could perform a monitoring job where she could get up and down and stretch at will, Plaintiff stated that she would be unable to perform that job. She testified that she needed to lie down to relieve the pain and take naps due to lack of sleep. (Tr. 297-98)

Counsel for Plaintiff clarified that Plaintiff's first back surgery was February 10, 2011, and her fourth surgery was March 23, 2011. Counsel also questioned Plaintiff regarding her

4

back pain. She stated that the weather affected her back and foot pain. Plaintiff further testified that her house was about 50 feet from the chickens. She sat down with the chickens and then walked back to the house and sat in a chair, her bed, or the couch. With regard to her medications, Plaintiff stated that the Oxycodone made her blurry and tired. She had trouble concentrating and remembering. She also had a difficult time following simple instructions. (Tr. 298-300)

A vocational expert ("VE") also testified at the hearing. The VE outlined Plaintiff's prior jobs as a nurse's assistant, which was medium work; a cashier, which was light work; and clerk running errands and answering the phone, which was also light work. The ALJ then asked the VE to assume an individual with those past jobs who was limited to sedentary exertional jobs. Sedentary was defined as lifting and carrying no more than 10 pounds; sitting for six hours; standing/walking for two hours; no pedal usage with the right foot; occasionally climbing ramps and stairs; never climbing ladders and scaffolds; frequently balancing; occasionally stooping, kneeling, crouching, and crawling; no exposure to hazards such as unprotected heights or moving mechanical parts; occasionally operating a motor vehicle; occasional exposure to humidity, wetness, extreme cold, and extreme heat; and occasional exposure to vibration. Given this hypothetical, the individual would not be able to perform any past jobs. However, the person could work as a charge account clerk in a business environment; a cutter and paster of press clippings; and a dowel inspector in a woodworking environment. (Tr. 301-04)

In the second hypothetical, the ALJ asked the VE to assume the same limitations in the first hypothetical plus only occasionally reaching overhead; no climbing ramps and stairs; occasionally balancing and stooping; no kneeling, crouching, or crawling; no driving; and no exposure to extreme cold or vibration. With the additional limitations, the individual could

5

perform all the positions the VE previously mentioned. If the ALJ added further limitations including simple, routine, and repetitive tasks with simple instructions, as well as being off-task but accommodated by normal breaks, the person could still perform the jobs of cutter and paster of press clippings and dowel inspector. The individual could also work as a surveillance system monitor. (Tr. 304-06)

The next hypothetical removed the mental limitations and added that the person would be off-task 20 percent of the work day in addition to normal breaks. The VE testified that no jobs would exist which the person could perform. If the individual was absent two or more days per month, no jobs would exist because most jobs allow no more than seven absences the first year according to the Bureau of Labor Statistics. (Tr. 306-08)

In a Function Report – Adult, Plaintiff reported that during the day she took her medication, fed the animals, ate breakfast, tried to relax, cooked lunch, cleaned the kitchen, sometimes vacuumed, rested on the couch, elevated her foot with ice, took medication, talked on the phone, cooked dinner, cleaned up the kitchen, lay down with a heating pad on her back, and slept. She slept only 1 to 4 hours a night. She was depressed all the time and had trouble remembering things. Plaintiff was able to prepare frozen dinners, sandwiches, toast, pudding, and jello. She could feed the dogs, perform light house cleaning, and do some laundry. She was unable to do heavy laundry or drive a lawn mower due to pain, numbness, and swelling. Plaintiff shopped for clothing and groceries once a week. She had difficulty handling money. Plaintiff enjoyed her animals and watching TV. She also liked outdoor activities such as gardening and boating. She could no longer do yard work. Plaintiff attended physical therapy and doctor's appointments. She did not have much of a social life but saw friends twice a month. Plaintiff reported that her conditions affected her ability to lift, squat, bend, stand, reach, walk, sit, kneel,

6

stair climb, remember, concentrate, and understand. She could walk 150 to 200 feet. When she was home she needed to rest for an hour; when she went grocery shopping, she needed to rest all day. She could follow short written and slow spoken instructions. Plaintiff got along well with authority figures. She did not handle stress or changes in routine very well. She used a brace and walker, which were prescribed by doctors. (Tr. 495-502)

Plaintiff also provided a typed document stating that she could lift 10 pounds but only for short periods. She could squat and bend but not without pain. She was able to stand for 15 to 30 minutes before needing to sit down. Plaintiff could reach items that were close, but she had trouble reaching out, not up, to grab things. Plaintiff stated that she walked 200 feet to feed the chickens. However, if she walked in the yard too much, she would experience pain and need to lie on the couch. When she sat in a kitchen chair, she needed to stand up and move around after 20 minutes. She had trouble sitting an hour during a doctor visit and sitting for three hours in a vehicle to get to the appointments. Plaintiff could kneel but had trouble climbing stairs. She experienced difficulty with memory, concentration, and understanding. (Tr. 503-04)

Plaintiff's husband completed a Function Report Adult – Third Party. His report essentially mirrored Plaintiff's. He stated that Plaintiff's conditions affected her ability to lift, sit, climb stairs, squat, kneel, bend, stand, walk, remember, and concentrate. She could walk 50 to 75 yards before needing to rest between 15 to 20 minutes or hours. She could pay attention for 15 minutes. Plaintiff did not follow written instructions very well but could follow spoken instructions. She did not handle stress well and cried all the time. (Tr. 513-20)

### III. Medical Evidence

In August 2010, Plaintiff suffered a back injury while working, resulting in an L5-S1 herniation with left leg radiculopathy. Plaintiff received physical therapy, which did not help.

7

She underwent four back surgeries between February and March 2011. After the first surgery, Plaintiff developed right lower extremity pain, numbness, and weakness. (Tr. 581-82, 590-91, 830-48, 894-95, 901-03, 42-44, 981-83, 1035-42) Plaintiff was treated with pain management services and physical therapy. (Tr. 581-85, 677-99, 751-64, 1046-87)

Treatment records from July 11, 2011 show that Plaintiff's incision healed, and her x-rays looked good. (Tr. 842) Dr. James J. Coyle noted on August 24, 2011 that Plaintiff had mild tenderness to palpation at the level of her incision. However, x-rays showed the fusion had consolidated nicely. He planned to order a CT scan to confirm. (Tr. 840)

On October 24, 2011, Plaintiff complained of back and right foot pain, as well as discoloration of the foot. Plaintiff's ankle dorsiflexion was intact, and there were no nerve root tension signs. She could forward flex sixty degrees at the waist. Plaintiff ambulated unassisted and had no antalgia of gait or postural shift. She did have tenderness to palpation on the right side in the paralumbar region. The CT scan showed solid fusion with no evidence of nerve root compression. Dr. Coyle advised Plaintiff to continue walking as much as possible. He thought a repeat EMG nerve conduction study could be helpful. (Tr. 834)

Dr. Coyle noted on January 17, 2012 that Plaintiff could forward flex forty-five degrees. She had weak plantar flexion but no antalgia of gait. Straight leg raise test was negative, and she achieved dorsiflexion on ambulation. Dr. Coyle noted no calf or quadriceps atrophy. He opined that Plaintiff would benefit from a course of conditioning exercises followed by a functional capacity evaluation. (Tr. 830)

Plaintiff was also treated by Dr. Lizette Alvarez. On July 1, 2011, Plaintiff reported feeling better with some pain and weakness in the right foot. She reported problems sleeping. Range of motion was within normal limits, and strength was 5/5. Her gait was normal. Dr.

8

Alvarez planned to wean Plaintiff off OxyContin and give her a script for a driver's evaluation and an air cast. (Tr. 825) Plaintiff reported some back pain but mostly foot pain on August 5, 2011. She felt her range of motion was slowly improving. Plaintiff reported being frustrated because she was secluded at home and wanted to go out with her friends. Dr. Alvarez noted slow but adequate progress. (Tr. 824)

On September 13, 2011, Dr. Alvarez stated that there were numerous instances where the physical examination did not correlate with Plaintiff's complaints of persistent low back and right lower extremity pain. Her range of motion was normal. Dr. Alvarez noted symptom magnification. He suggested returning to work three days a week and slowly increasing the amount of time at work. (Tr. 822-23)

When Plaintiff returned on October 25, 2011, she stated she was unable to work due to increased pain with sitting. She could only tolerate about two hours of sitting. However, on examination, Plaintiff was in no acute distress. Plaintiff was able to go from supine to sit, and from sit to stand independently, without difficulty or signs of discomfort. Straight leg raise was negative, and strength was normal throughout the lower extremities. Dr. Alvarez again noted signs of symptom magnification. Dr. Alvarez recommended that Plaintiff continue working three days a week, beginning with two hours a day and increasing the hours as she built tolerance. (Tr. 821)

On January 13, 2012, Dr. Alvarez noted that Plaintiff's pain and numbness had been unchanged for several months. However, on physical examination, Plaintiff was in no acute distress, and her strength was improving. Recent EMG nerve conduction studies revealed improvement from the prior study. Dr. Alvarez opined that Plaintiff was at maximum medical improvement ("MMI") and should follow up with her psychiatrist and Dr. Coyne. Dr. Alvarez

encouraged Plaintiff to continue with her home exercise program and noted that she was restricted to sedentary work. (Tr. 820)

Plaintiff also received mental health treatment related to her physical impairments. Elizabeth F. Pribor, M.D., P.C., evaluated Plaintiff on July 18, August 8, and August 26, 2011. In a report dated September 26, 2011, Dr. Pribor opined that Plaintiff's pain disorder was caused by the surgeries and subsequent lack of recovery. Her somatoform disorder NOS was indirectly related to her work injury, as she was most focused on her pain. For example, Plaintiff complained of swelling in her feet when physicians found minimal or no swelling. Although she complained of being unable to sit for long periods, she was able to sit for more than an hour on three visits with Dr. Pribor. Further, Dr. Pribor stated that Plaintiff's prognosis was poor due to her low self-image and extreme negativity. Dr. Pribor concluded that Plaintiff's pervasively victimized attitude would make it difficult for her to progress. (Tr. 702-27)

Bette Fletcher, Ph.D., a clinical psychologist, evaluated Plaintiff on September 21, 2011 for complaints of insomnia, fear of going to work, memory problems, and depression. She expressed a desire to sit and walk more than an hour and to sleep. Dr. Fletcher planned to work with Plaintiff on pain management strategies, sleep relaxation, and attitude changes. She assessed pain disorder with psychological factors and general medical condition, chronic, and major depression, moderate. (Tr. 811-13) During subsequent sessions, Dr. Fletcher discussed decreasing the use of pain medications and focusing on positive things instead of the pain. (Tr. 803-10) On October 31, 2011, Plaintiff agreed to walk more, watch what she ate, tell herself positive things, and exercise patience. (Tr. 801-02)

On December 16, 2011, Plaintiff reported that she had lost her job. However, she stated that she was able to sit and walk longer without bringing on too much pain. Her sleep was better

and she felt more rested. (Tr. 795-96) On January 5, 2012, Plaintiff complained of worsening pain. Dr. Fletcher noted that Plaintiff was feeling tired and negative. She was irritable and complained a lot. Dr. Fletcher suggested that Plaintiff needed restful sleep and positive, coping self-statements. (Tr. 794) On November 29, 2012, Plaintiff reported that she had gone to the ER when she ran out of Oxycodone, but the physician would not renew the prescription because he thought she was not taking the medication as directed. Dr. Fletcher opined that Plaintiff was abusing her pain medication but was not addicted. (Tr. 1093) On January 7, 2013, Plaintiff reported that she recently enjoyed watching her goddaughter bowl and spending time with family. Plaintiff reported that she was getting better at pacing herself by doing chores at home in intervals and resting in between. Dr. Fletcher noted that Plaintiff was still fighting moderate depression but was slowly making the psychological adjustment to her disability. (Tr. 1094)

On March 6, 2012, Nancy Caeser, M.D., completed a Disability Determination Explanation based on Plaintiff's subjective complaints and the medical records. Dr. Caeser found Plaintiff's subjective allegations regarding her symptoms partially credible due to some evidence of symptom magnification and the severity alleged by Plaintiff. Dr. Caeser opined that Plaintiff could lift 10 pounds occasionally and less than 10 pounds frequently; stand and/or walk 2 hours; and sit 6 hours. Pushing and pulling were limited in the right lower extremities, and Plaintiff had limited pedal usage due to right foot nerve dysfunction and numbness. She could occasionally climb ramps/stairs, stoop, kneel, crouch, and crawl. Plaintiff could never climb but could frequently balance. In addition, Plaintiff needed to avoid concentrated exposure to extreme cold, extreme heat, wetness, humidity, and exposure. She had to avoid all exposure to hazards. Dr. Caeser limited Plaintiff to sedentary work. She reasoned that the medical evidence showed some limitations to Plaintiff's ability to engage in certain work-related activities but not

11

all types of work. While Plaintiff could not perform her past relevant work, she could perform work that was less demanding. (Tr. 309-21)

A Functional Capacity Evaluation performed on January 9, 2013 revealed subjective pain at a level of 10 at the beginning and end of the evaluation. Plaintiff did not display consistent observable pain behaviors. The evaluator, Jean C. Stiles, MPT/L, noted that Plaintiff ambulated into the clinic with minimal decreased right hip extension and decreased toe off in gait, but no significant lean. She demonstrated increased lean upon standing. Her standing posture showed increased lumbar lordosis with moderate rounded shoulders bilaterally and minimal forward head. When Plaintiff sat in the waiting room, she had minimal weight shift and occasional knee extension. During the subjective intake, she changed posture with sudden leans and casually kicked off shoes and extended her knees. Plaintiff told Ms. Stiles that she could not complete any further activities after the subjective intake. Ms. Stiles offered Plaintiff an opportunity to rest and then try the physical examination, but Plaintiff refused. She stated that her pain was increasing and she did not want to go beyond her tolerance. (Tr. 1098-99)

Medical evidence not before the ALJ but submitted to the Appeals Council included a Vocational Rehabilitation Evaluation conducted on October 7, 2013 by Delores E. Gonzales, M.Ed., L.P.C., C.R.C., C.D.M.S. In addition, Plaintiff submitted medical records from Bryan Medical Center dated June 24, 2013 through June 26, 2013, as well as a letter from John C. Lucio, D.O. On June 21, 2013, Dr. Lucio wrote that based on Plaintiff's history and physical exam findings, "it would be reasonable for Ms. Fagler to apply for social security benefits." (Tr. 239)

On June 24, 2013, Plaintiff was admitted to Bryan Medical Center in Lincoln, Nebraska for complaints of nausea, vomiting, and chronic low back pain. Initial examination revealed

some point tenderness in the lumbosacral region around the L4-5 vertebral level. Power was 4+/5 in the lower extremities bilaterally. Sensation was present in the right lower extremity, and reflexes were equal bilaterally and brisk. An MRI of the lumbar spine showed postoperative changes at L5-S1 without significant spinal stenosis, mild levels of disk degeneration, and disk bulging. There was no evidence of disk herniation. Diagnoses on discharge were acute on chronic back pain, itching and nausea likely secondary to pain medication, and depression. The physician noted that Plaintiff had a pain contract established with a pain specialist in Missouri and that she was on chronic Percocet. (Tr. 54-58, 83, 89-90, 95-96)

On December 9, 2013, Delores Gonzales sent a Vocational Rehabilitation Evaluation letter to Plaintiff's attorney. Ms. Gonzales noted that Plaintiff was able to go boating and had gone out ten times over the summer. Ms. Gonzales assessed Plaintiff's subjective interview, her vocational history, and the medical records. She opined that Plaintiff had permanent physical disabilities that prevented her from performing her past jobs or any job on the open market due to her severely reduced residual functional capacities. Ms. Gonzales noted Plaintiff's chronic pain and prescriptions for narcotic medication. The medication affected Plaintiff's concentration and made it difficult for her to stay on task. Ms. Gonzales concluded that Plaintiff was not a candidate for vocational rehabilitation based because she was not capable of competitive work as a result of her work related injury on August 19, 2010. (Tr. 17-49)

### **IV. The ALJ's Determination**

In a decision dated June 3, 2013, the ALJ found that the Plaintiff met the insured status requirements of the Social Security Act through December 31, 2015. She had not engaged in substantial gainful activity since August 19, 2010, the alleged onset date. The ALJ further found that Plaintiff's severe impairments included post lumbar multiple surgeries (with both right and

13

left radiculopathy) and peripheral neuropathy. However, she did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1). (Tr. 243-47)

After carefully considering the entire record, the ALJ found that Plaintiff had the residual functional capacity ("RFC") to perform sedentary work, except Plaintiff could lift and carry ten pounds occasionally and less than ten pounds frequently. She could sit for six hours and stand and/or walk for two hours in an eight-hour workday. In addition, she was limited to pushing and pulling in that she could not have any pedal usage with her right foot. She could only occasionally reach overhead. Further, Plaintiff could occasionally balance and stoop, but she could never kneel, crouch, crawl, or climb ramps, stairs, ladders, ropes, or scaffolds. She could have occasional exposure to humidity, wetness, and extreme heat. However, she could have no exposure to extreme cold, vibration, or working around unprotected heights or moving mechanical parts. Last, Plaintiff could never drive on the job. The ALJ assessed Plaintiff's treatment records, medical opinion evidence, and her testimony to find that the evidence failed to support Plaintiff's assertions that she was totally disabled. (Tr. 247-51)

The ALJ further found that Plaintiff was unable to perform her past relevant work. However, based on her younger age on the alleged onset date, high school education, work experience, and RFC, the ALJ determined that jobs existed in significant numbers in the national economy that the Plaintiff could perform. These jobs included charge account clerk, cutter/paster, and dowel inspector. Thus, the ALJ concluded that Plaintiff had not been under a disability, as defined in the Social Security Act, from August 19, 2010 through the date of the decision. (Tr. 251-53)

14

## V. Legal Standards

A claimant for social security disability benefits must demonstrate that he or she suffers from a physical or mental disability. The Social Security Act defines disability "as the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 404.1505(a).

To determine whether a claimant is disabled, the Commissioner engages in a five step evaluation process. *See* 20 C.F.R. § 404.1520(a)(4). Those steps require a claimant to show: (1) that claimant is not engaged in substantial gainful activity; (2) that she has a severe physical or mental impairment or combination of impairments which meets the duration requirement; or (3) she has an impairment which meets or exceeds one of the impairments listed in 20 C.F.R., Subpart P, Appendix 1; (4) she is unable to return to her past relevant work; and (5) her impairments prevent her from doing any other work. *Id.*

The Court must affirm the decision of the ALJ if it is supported by substantial evidence. 42 U.S.C. § 405(g). "Substantial evidence means less than a preponderance, but sufficient evidence that a reasonable person would find adequate to support the decision." *Hulsey v. Astrue*, 622 F.3d 917, 922 (8th Cir. 2010). "We will not disturb the denial of benefits so long as the ALJ's decision falls within the available zone of choice. An ALJ's decision is not outside the zone of choice simply because we might have reached a different conclusion had we been the initial finder of fact." *Buckner v. Astrue,* 646 F.3d 549, 556 (8th Cir. 2011) (citations and internal quotations omitted). Instead, even if it is possible to draw two different conclusions from the evidence, the Court must affirm the Commissioner's decision if it is supported by substantial evidence. *See Young v. Apfel,* 221 F.3d 1065, 1068 (8th Cir.2000).

To determine whether the Commissioner's final decision is supported by substantial evidence, the Court must review the administrative record as a whole and consider: (1) the credibility findings made by the ALJ; (2) the plaintiff's vocational factors; (3) the medical evidence from treating and consulting physicians; (4) the plaintiff's subjective complaints regarding exertional and non-exertional activities and impairments; (5) any corroboration by third parties of the plaintiff's impairments; and (6) the testimony of vocational experts when required which is based upon a proper hypothetical question that sets forth the plaintiff's impairment. *Johnson v. Chater*, 108 F.3d 942, 944 (8th Cir. 1997) (citations and internal quotations omitted).

The ALJ may discount a plaintiff's subjective complaints if they are inconsistent with the evidence as a whole, but the law requires the ALJ to make express credibility determinations and set forth the inconsistencies in the record. *Marciniak v. Shalala*, 49 F.3d 1350, 1354 (8th Cir. 1995). It is not enough that the record contain inconsistencies; the ALJ must specifically demonstrate that she considered all the evidence. *Id.* at 1354.

When a plaintiff claims that the ALJ failed to properly consider subjective complaints, the duty of the court is to ascertain whether the ALJ considered all of the evidence relevant to plaintiff's complaints under the *Polaski*[1] factors and whether the evidence so contradicts plaintiff's subjective complaints that the ALJ could discount the testimony as not credible. *Blakeman v. Astrue*, 509 F.3d 878, 879 (8th Cir. 2007) (citation omitted). If inconsistencies in

---

[1] The Eight Circuit Court of Appeals "has long required an ALJ to consider the following factors when evaluating a claimant's credibility: '(1) the claimant's daily activities; (2) the duration, intensity, and frequency of pain; (3) the precipitating and aggravating factors; (4) the dosage, effectiveness, and side effects of medication; (5) any functional restrictions; (6) the claimant's work history; and (7) the absence of objective medical evidence to support the claimant's complaints.'" *Buckner v. Astrue*, 646 F.3d 549, 558 (8th Cir. 2011) (quoting *Moore v. Astrue*, 572 F.3d 520, 524 (8th Cir. 2009)) (citing *Polaski v. Heckler*, 739 F.2d 1320, 1322 (8th Cir. 1984)).

the record and a lack of supporting medical evidence support the ALJ's decision, the Court will not reverse the decision simply because some evidence may support the opposite conclusion. *Marciniak*, 49 F.3d at 1354.

## VI. Discussion

Plaintiff raises four arguments in her Brief in Support of the Complaint.[2] First, she asserts that the ALJ selectively relied on portions of the treating physician's opinion without explaining why the ALJ did not accept the entire opinion. Second, Plaintiff claims that new evidence before the Appeals Council warrants reversing the ALJ's decision. Next, Plaintiff contends that the Court should remand the case for review by SSA's medical staff because key medical evidence was added since a medical consultant last reviewed the file. Finally, Plaintiff argues that the ALJ erred in failing to consider a "closed period" of disability. The Defendant responds that the ALJ properly analyzed Plaintiff's credibility and the medical opinion evidence in determining Plaintiff's RFC. Defendant also maintains that the new evidence does not undermine the ALJ's decision. Finally, the Defendant contends that Plaintiff failed to prove she was entitled to a closed period of disability.

Plaintiff contends that the submission of new evidence warrants reversal of the ALJ's decision. Defendant responds that the letter from Dr. Lucio dated June 21, 2013, the medical records from June 24, 2013 through June 26, 2013, and the evaluation from Dolores Gonzales dated December 9, 2013 do not show that Plaintiff had a disabling condition during the relevant time period.

---

[2] The Court advises Plaintiff's attorney that the brief is not in compliance with E.D. Mo. L.R. 2.01 which requires filings, unless otherwise permitted by leave of Court, to be double spaced typed.

Courts may remand a case for review of additional evidence only where the new evidence is material and the plaintiff shows good cause for failing to incorporate the evidence in to the record of the prior proceeding. *Hepp v. Astrue*, 511 F.3d 798, 808 (8th Cir. 2008) (internal quotation omitted) (citing 42 U.S.C. § 405(g)). To be considered material, "new evidence must be 'relevant, and probative of the claimant's condition for the time period for which benefits were denied.'" *Estes v. Barnhart*, 275 F.3d 722, 725 (8th Cir. 2002) (quoting *Jones v. Callahan*, 122 F.3d 1148, 1154 (8th Cir. 1997)). Further, there must be a reasonable likelihood that the evidence would have changed the determination. *Woolf v. Shalala*, 3 F.3d 1210, 1215 (8th Cir. 1993). "Where, as here, the Appeals Council considers new evidence but denies review, we must determine whether the ALJ's decision was supported by substantial evidence on the record as a whole, including the new evidence." *Davidson v. Astrue*, 501 F.3d 987, 990 (8th Cir. 2007) (citations omitted).

At the outset, the undersigned notes that the Appeals Council considered this additional evidence and determined that the information pertained to a later time and did not affect the decision as to whether Plaintiff was disabled beginning on or before June 3, 2013, the date of the ALJ's decision. (Tr. 2) Plaintiff contends that the new evidence relates back to the alleged onset date and was unavailable at the time of the hearing. The Court notes that the records from the Bryan Medical Center pertained to lower back pain and neuropathy stemming from Plaintiff's back injury and subsequent surgeries. (Tr. 89) Further, the letter from Dr. Lucio pertains to Plaintiff's medical history, not a new onset of symptoms. (Tr. 239) Finally, a Vocational Expert thoroughly assessed all of the evidence and evaluated Plaintiff personally. Ms. Gonzales determined that Plaintiff was unable to perform any job based on her work-related injury of August 19, 2010. (Tr. 17-49) The Court finds that this evidence pertains to the Plaintiff's

18

condition during the time period for which benefits were denied. *Dobbins v. Colvin*, No. 4:15CV356 DDN, 2016 WL 695605, at *8 (E.D. Mo. Feb. 22, 2016).

Further, Plaintiff maintains that she can show good cause because the records were unavailable at the time of the hearing. "The fact that medical records did not exist at the time of the administrative hearing may constitute good cause." *Parker v. Apfel*, 998 F. Supp. 1070, 1077 (E.D. Mo. 1998). While Defendant claims that the medical evidence is not closely enough related in time to be probative of Plaintiff's condition during the relevant period, the Court notes that Plaintiff was hospitalized in June, 2013, the same month the ALJ rendered his opinion. Dr. Lucio sent the letter to Plaintiff's attorney that same month as well. Ms. Gonzales performed her evaluation four months after the ALJ's decision, but well in advance of the Appeals Council's review. "[N]ew evidence may be material despite post-dating the ALJ decision." *Dobbins,* 2016 WL 695605, at *8. In *Dobbins*, the court found that the new evidence "offered insight into the severity of plaintiff's previously alleged back impairments . . . ." *Id.* Likewise, this Court finds that the new evidence submitted by Plaintiff is material and probative of Plaintiff's back problems and neuropathy.

Because the Court finds that the evidence is new and material, the case should be remanded to the ALJ for review of the evidence to determine their relevance to Plaintiff's claim of disability and to further develop the medical record, if necessary. *See Sluka v. Colvin*, No. 4:13CV948 ACL, 2014 WL 4814687, at *14 (E.D. Mo. Sept. 24, 2014) (remanding to the ALJ to consider relevant new evidence, formulate a new RFC, and further develop the evidence, if necessary, where new evidence did not support the ALJ's RFC determination). "Although the Court is aware that upon remand, the ALJ's decision as to non-disability may not change after properly considering all evidence of record and undergoing the required analysis . . . , the

determination is nevertheless one that the Commissioner must make in the first instance."

*Cohadarevic v. Colvin*, No. 4:12CV1835 TCM, 2014 WL 1211507, at *13 (E.D. Mo. March 24, 2014) (internal citation omitted).

Accordingly,

**IT IS HEREBY ORDERED** that the final decision of the Commissioner denying social security benefits be **REVERSED and REMANDED** to the Commissioner for further proceedings consistent with this Memorandum and Order. An appropriate Order of Remand shall accompany this Memorandum and Order.

Dated this 14th day of March, 2016.

/s/ Ronnie L. White
**RONNIE L. WHITE**
**UNITED STATES DISTRICT JUDGE**